## No. 23166.

### FRED SIMPSON, JR., EXECUTOR OF THE ESTATE OF ELMER HARTNER, DECEASED v. MILLERS NATIONAL INSURANCE COMPANY.

(486 P.2d 12)

Decided June 21, 1971.

IRELAND, STAPLETON, PRYOR & HOLMES, BENJAMIN F. STAPLETON, STANLEY M. LIPNICK, for plaintiff in error.

WOOD, RIS & HAMES, WILLIAM K. RIS, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE DAY.

THIS action arose out of a claim for fire loss on a policy issued by Millers National Insurance Company. We will refer to the parties as they appeared in the trial court where Simpson, as executor of the estate, was plaintiff.

The policy insured a brick building in lower downtown Denver owned by the estate of Elmer Hartner. It had been issued in 1958 and renewed in 1961 to decedent Hartner with the building rated as a general warehouse.

In rejecting the claim of plaintiff, the defendant contended the building was rented by plaintiff to a tenant engaged in manufacturing mattresses and that the use with its attendant volatile cotton matting and dust increased the hazard over that contemplated by use as a warehouse. Under its terms, the policy was suspended during the period of the hazardous use if notification of change in use was not communicated to the company and if the additional premium were not paid. The particular clause relied on in the policy provided:

*"Conditions suspending or restricting insurance.* Unless otherwise provided in writing added hereto this Company shall not be liable for loss occuring, (a) While the hazard is increased by any means within the control or knowledge of the insured * * *." (Emphasis added.)

The trial court found in favor of the defendant. We affirm the holding of the court.

I.

Plaintiff contends first that the defendant is estopped to refuse payment of the proceeds of the policy due to its failure to return premiums paid by the plaintiff as of the time of the loss. Following the fire, defendant refunded that portion of the premium which was un-

earned — that for the policy period subsequent to the fire. No demand or counterclaim was ever made by the plaintiff for the *return* of the premiums *earned* as of the time of the loss, and these premiums have not been returned by the defendant.

In holding that the defendant was not estopped from refusing payment by its failure to return those premiums earned, we choose not to pass on the question of whether the policy here under consideration was void *ab initio,* or whether coverage was merely suspended during the period of which the hazard or risk was increased. Rather, our holding is posited upon the theory that where, as here, the insurer did not acquire knowledge of the change (a point discussed in detail under heading II) until after the loss for which indemnity is claimed, there is no waiver or estoppel by a failure to return premiums.

"Nor can the mere retention of the premium, after the loss has occurred, and where the liability is steadfastly denied, constitute either a waiver of the defense or an estoppel. To constitute such waiver or estoppel by the action or nonaction of the insurer after the loss, it is essential that one party should have relied upon the conduct of the other and been induced by it to put himself in such a position that he would be injured if the other should be allowed to repudiate his action. * * * Here nothing was done which could have led the insured to believe that the defendant would not take advantage of the breach of warranty. Upon the contrary, it persistently asserted its reliance upon such breach." *Goorberg v. Western Assurance Co.,* 150 Cal. 510, 89 P. 130 (1907) (Footnotes omitted.)

For other cases in accord see *Capital Fire Insurance Co. v. Shearwood,* 87 Ark. 326, 112 S.W. 878 (1908); *Green v. Phoenix Insurance Co. of Hartford,* 215 Iowa 1220, 247 N.W. 660 (1933); *Ferraiolo v. Commonwealth Insurance Co. of New York,* 39 Misc. 2d 151, 240 N.Y.S.

2d 270 (1964), *judgment reversed on other grounds* 42 Misc. 2d 228, 247 N.Y.S. 2d 844.

■ In an early case, this court followed the general rule that, in the usual instance of policy defenses, a return of premiums paid, or tender thereof is not necessary prior to defending against the claim. *Security Association v. Henning,* 74 Colo. 394, 222 P. 396 (1924). For a collection of cases in accord, see 20 *J. Appleman, Insurance Law and Practice* 349 (1963).

II.

Plaintiff next alleges that defendant had knowledge of the alleged increase of hazard and did not act to change the policy or repudiate coverage. Since there was no evidence presented to the court below of any actual knowledge by the defendant of the change in use we are asked — as was the trial court — to impute knowledge to defendant from other sources. Plaintiff argues that this information of a change to the hazardous use can be imputed from either or both of the following sources: The Mountain States Inspection Agency (Mountain States herein) which rerated the property prior to the loss, or from the O'Brien Insurance Agency (O'Brien herein), which issued the policy in 1958 and its renewal in 1961, and to whom notice of the change in rating was sent by Mountain States prior to the loss.

We first turn to the question of whether knowledge on the part of Mountain States is imputed to the defendant. The evidence presented below indicated that an insurance agency other than O'Brien made a request for a rerating of the property sometime prior to the renewal of the policy in January, 1961, although such rerating was not completed and announced until after such renewal. This rerating recognized the increase of hazard occasioned by the change in use from a general warehouse to a cotton processing plant and resulted in a notice of a higher insurance rate being published and forwarded to various agencies and companies, although apparently not to the defendant.

■ The trial court found that Mountain States was *not* an agent of the defendant and therefore any knowledge of greater hazard or increased rates was not imputed to the defendant. Under the circumstances herein, we approve the finding. The manager of Mountain States testified that Mountain States is an unincorporated association licensed in Colorado to establish property insurance rates for its associates:

"(1) (a) A corporation, an unincorporated association, a partnership or an individual, whether located within or outside this state may make application to the commissioner for license as a rating organization for such kinds of insurance, or subdivision or class of risk or a part or combination thereof as are specified in its application * * *." C.R.S. 72-11-6.

Section 72-11-4 requires all insurers to file their rates with the Commissioner of Insurance, but provides that an insurer may satisfy its obligation to make such filings by becoming a member of, or a subscriber to, a licensed rating organization which makes such filings. It is further provided that its rating services must be made available to all insurers, even though not a member, in accordance with the rules and regulations approved by the Commissioner as reasonable. Such rating organizations as Mountain States are given various powers and are made subject to various restrictions.

The manager of Mountain States further testified that close to 300 companies and 600 agents are served by this organization, and he summarized the functions of the bureau to include the inspection of buildings and the establishment of fire rates therefor, the furnishing of information as to the rates so established to insurers and agents, and the auditing of policies as written.

Plaintiff contends that this organizational structure establishes an agency relationship between such inspection bureau and the insurance companies and agencies which it serves, and therefore when Mountain States completed its inspection and assigned higher rates due

to the change in use, the defendant, and all other member companies and agencies as well, were charged with knowledge of such rerating. We cannot agree. We have previously held that:

"(1) The relationship between an agent and his principal is a contractual one and the extent of the rights and duties of each is to be found in the express or implied terms of the agency contract. The record before us is devoid of proof of such rights and duties." *Baumgartner v. Burt*, 148 Colo. 64, 365 P.2d 681 (1961).

In the instant case, the only evidence of any agency relationship are the statutory provisions dealing with the creation and operation as summarized above. A close examination of these provisions does not disclose any requirement that the evidence of rerating is to be transmitted to insurers other than those specifically making a request for such information. The defendant made no such request.

Plaintiff insists, however, that if the knowledge of Mountain States was not imputed to the defendant, such knowledge was transmitted to the O'Brien Agency (which issued the policy and its renewal) and therefore to the insurer.

The evidence presented at trial indicated that information of the rerating was forwarded to O'Brien *after* the policy had been renewed. Further, there was no showing that O'Brien had any knowledge of the change in use from any independent source prior to the renewal of the policy in January, 1961. What the evidence did establish was that on February 7, 1961, Mountain States published a new rate for both the building and its contents based on the change in use and at the request of another agency for a company other than the defendant. Of the approximately 900 insurers and agencies who are members of the inspection bureau, only 150 to 200, including O'Brien, received the weekly rate sheets disclosing the rate changes. O'Brien did not make it a policy to closely scrutinize such changes, but merely

looked over the addresses to see if any looked familiar, and if so, an attempt was made to contact the insured to inquire as to whether additional insurance was desired. We hold that from the evidence there was no duty upon or commitment by O'Brien to subscribe to the rate sheets or to check them. The mere fact that the agency received changes in rates from time to time is not equivalent of knowledge. It would be an anomalous situation to impose a greater duty upon an agent who received rate sheets to study them and notify his principal of changes with no similar duty on the part of the more than 75 per cent of the agents and companies who did not receive the rate sheets. As the court found, the peculiar knowledge of the insured as to the use of his building imposes the duty on him to advise the insurer of the change and not vice versa.

 In the absence of a showing of the nature of such relationship, we are unable to conclude that O'Brien was other than merely the issuing agent and therefore information gained following the issuance of the policy is not imputed to the insurer:

"Several cases have held bluntly that the knowledge of a soliciting agent will not be charged to the insurer. It has more correctly been held that information of an agent soliciting insurance is not attributable to the insurer, unless imparted to the agent in the course of the agency. And since a soliciting agent's authority is generally terminated upon the execution of a policy or its delivery, information and knowledge received by him subsequent to that time is not chargeable to the insurer." J. Appleman, 16A Insurance Law and Practice 382 (1968). (Footnotes and citations omitted.)

### III.

It is asserted that the hazard of maintaining a cotton processing plant was substantially the same as that for a general warehouse, and therefore the increase of hazard clause quoted *supra* was not applicable, and the

insurance not suspended. In support of this position, plaintiff introduced evidence to show that a general warehouse *without* stipulations as to use would incur a rate of 483 percent of the base charge, while a cotton or fiber processing plant would incur a rate of 513 percent of the base charge — a difference in actual rates of only some 6%.

The question of the amount of increase in hazard and increase in rate was much in dispute. Other equally competent evidence indicated that the difference in rates would have been substantially greater. The actual rate on the building was $.68 per hundred, while the rate established by Mountain States after rerating was $1.65 per hundred. The building was being utilized for a purpose not in accord with that for which the policy was written. The occupancy by fiber products was shown to be extremely hazardous. There was open heat in the same room as was the cotton processing machine.

We have previously held, in accordance with other jurisdictions, that where the evidence establishes an increase in the hazard or risk to the insurer, the provisions of the polcy suspending the insurance are to be enforced:

"Where the provisions of a policy are couched in plain and unambiguous language and do not contravene some principle of public policy, we have no right to relieve one of the parties to the contract from its disadvantageous terms by a forced construction or interpretation of its provisions. It must be given the meaning which a person of ordinary intelligence would attach to them." *Standard Marine Insurance v. Peck,* 140 Colo. 56, 342 P.2d 661 (1959). *See General Accident Fire and Life Assurance Corp. v. Heller,* 127 Colo. 64, 253 P.2d 966; *Saint-Paul Mercury Indemnity Co. v. Rutland,* 225 F.2d 689 (5th Cir. 1955).

The trial court found on the disputed evidence that the increase in hazard was substantial and that the suspension clause was applicable. A reviewing court will not

disturb a trial court finding supported by competent evidence.

IV.

Plaintiff contends in this argument that assuming *arguendo* that the hazard was increased, he was unaware that the use of the premises for cotton processing constituted a greater hazard than use as a general warehouse, and therefore the hazard was not increased within the control *and* knowledge of the insured. *See American Manufacturers Mutual Ins. Co. v. Wilson Keith Co.*, 247 F.2d 249 (8th Cir. 1957).

This argument is specious. Any statement by the plaintiff that he was unaware that cotton processing was more hazardous than general warehousing is subject to the same test of credibility to which every witness is put, and was here rejected by the trial court.

V.

■ The plaintiff last contends that there was no change of occupancy of the premises at any time after the 1961 renewal of the policy was issued, and that in issuing the 1961-1964 policy the defendant made no inquiry whatever as to the use of the building, and therefore is estopped from avoiding coverage on a ground which existed at the time the policy was issued.

The evidence was uncontradicted that O'Brien made inquiry at the time of renewal as to whether the plaintiff desired to change the coverage, and was advised to renew without any changes whatsoever being specified. The insured cannot stand mute, knowing of a change in use from warehousing to manufacturing and then later assert that the burden was on the insurer or issuing agent to discover such change. The trial court's finding that no waiver or estoppel existed was correct.

The judgment is affirmed.

MR. JUSTICE HODGES, MR. JUSTICE KELLEY and MR. JUSTICE GROVES concur.